**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marcus Powell,<br><br>    Plaintiff,<br><br>v.<br><br>Freedom Financial Network,<br><br>    Defendant. | No. CV-17-02445-PHX-BSB<br><br>Consolidated with<br><br>No. CV-17-2647-PHX-BSB<br><br>**ORDER** |

Defendant Freedom Financial Network, LLC d/b/a Freedom Debt Relief ("FFN" or "Defendant"), has filed a motion for summary judgment on Plaintiff's remaining claims in the Second Amended Complaint (the "SAC").[1] (Doc. 148.)[2] The remaining claims are Plaintiff's disparate treatment claim under the American with Disabilities Act ("ADA"), alleged in Count Three, and his constructive discharge claim alleged in Count Five. (*See* 17-2647 Docs. 26, 33; Doc. 65 at 24.) The motion is fully briefed. (*See* Docs. 149, 157, 158, 159, 161, 164.) As set forth below, the Court grants the motion.

## I.   Factual Background

Plaintiff's claims are based on his employment at FFN as a consumer debt relief account executive from October 19, 2015 until June 29, 2017. FFN provides various

---

[1] FFN is the only remaining Defendant in this matter. (*See* Doc. 65 at 1 n.1.)

[2] Citations to "17-2647 Doc." are to filings in case number CV-17-2647-PHX-BSB. Citations to "Doc." are to filings in case number CV-17-2445-PHX-BSB. The SAC is located at 17-2647 Doc. 26.

financial services through its subsidiaries, including debt resolution. (DSOF ¶ 1.)[3] FFN employs Account Executives ("AEs") to obtain customers for its debt reduction program. (DSOF ¶ 5.) On October 19, 2015, FFN hired Plaintiff as an AE. (DSOF ¶¶ 4; PCSOF ¶ 4.)[4] Plaintiff was paid an hourly wage plus commission based on the number of debt relief contracts he generated. (DSOF ¶ 4; PCSOF ¶ 4.) As set forth below, Plaintiff alleges that based on his disability, FFN took various actions that impeded his sales and, eventually, caused him to leave his job.

In October 2015, Plaintiff met with FFN's Senior Human Resources Business Partner Nicole Durkin regarding his benefits elections. (DSOF ¶¶ 15-16; Durkin Decl. at ¶ 4.)[5] Plaintiff told Durkin he wanted to enroll in the medical insurance plan with the lowest monthly employee premium. (Durkin Decl. at ¶ 4; PCSOF ¶ 16 (citing Powell Decl. at ¶ 12).) Plaintiff alleges that in January 2016, he discovered that FFN had changed his benefit plan when he filled a prescription and it cost him over $200, instead of $10. (PCSOF ¶ 20; Powell Depo at 110-13.) Plaintiff states that when he asked Durkin about this issue, she told Plaintiff he could not change his health insurance plan until open enrollment or unless he experienced a life event. (Powell Depo. at 113.)

Plaintiff and the other AEs were assigned sales leads through FFN's lead management software.[6] (DSOF ¶ 77.) The software system uses scoring and assignment algorithms to allocate leads based on a prospective client's reported needs and the AE's lead queue. (DSOF ¶ 78.) The scoring algorithm first assigns each prospective client with

---

[3] Citations to "DSOF" refer to Defendant's separate statement of facts. (Doc. 149.) The Court previously denied Plaintiff's motion to strike the DSOF and supporting evidence including declarations. (Doc. 165.)

[4] Citations to "PCSOF" refer to Plaintiff's response to the DSOF, and citations to "PSSOF" refer to Plaintiff's separate statement of facts. (Docs. 157 and 158.)

[5] The Durkin Declaration ("Durkin Decl.") is filed at Doc. 149, Ex. 18. The Powell Declaration ("Powell Decl.") is filed at Doc. 161. The Powell Deposition ("Powell Depo") is also filed at Doc. 149, Ex. 4.

[6] Plaintiff disputes FFN's description of the assignment of sales leads and its related software but does not provide any evidence to create a dispute on this issue. (*See* PCSOF ¶¶ 79-84.)

a score based on factors unique to that client, and then matches the prospective client with a group of AEs (or a "tier"). (DSOF ¶¶ 79-82.) Each AE on the first tier receives a pop-up window on their computer screen with the lead's information. (*Id*. at ¶ 81.) If the lead is not accepted by any AE within six seconds, the lead passes to the next tier, or tiers, until the lead is claimed. (DSOF ¶ 81.) Neither FFN's management team nor members of its Human Resources Department has access to or can manipulate FFN's lead generation data or its software's assignment algorithms. (DSOF ¶ 84; Gallegos Decl. at ¶ 13.)[7]

During Plaintiff's first three months of employment with FFN he was promoted and received a raise. (DSOF ¶ 32.) However, on March 31, 2016, FFN gave Plaintiff a verbal warning for unprofessional communication with a co-worker in violation of FFN's Business Ethics and Conduct policy. (DSOF ¶¶ 35-38; DSOF, Ex. 10.) On April 28, 2016, FFN received a Better Business Bureau ("BBB") complaint from a prospective client alleging that, after she told Plaintiff she was not interested in FFN's program, he sent her an email stating, "unfortunately you will never find any help and will be stuck in debt and continue wasting money [sic] Good luck."[8] (DSOF ¶¶ 38-41.) FFN issued Plaintiff a written warning for violating FFN's policy on "business ethics and conduct." (DSOF, Ex. 12.)

In April or May 2016, Plaintiff disclosed to Tom Carr, his team lead, that he took prescription medication for chronic pain. (DSOF ¶ 68; Carr Decl. at ¶ 6.)[9] Carr asserts that he did not share this information with anyone at FFN. (*Id*.) Plaintiff alleges that after he disclosed this information co-workers started asking if he would sell his pain pills, but he does not cite to any supporting evidence. (Doc. 159 at 4.)

During June 2016, Plaintiff closed fifteen new client enrollments. (DSOF ¶ 46; DSOF, Ex. 13.) During the preceding five months Plaintiff had closed an average of thirty-

---

[7] The Declaration of Kevin Gallegos ("Gallegos Decl."), senior vice president of new client enrollment and Phoenix operations, is filed at Doc. 149, Ex. 7.

[8] The Court previously denied Plaintiff's motion to strike evidence of the BBB complaint. (Doc. 165.)

[9] The Carr Declaration ("Carr Decl.") is filed at Doc. 149, Ex. 6.

nine enrollments per month. (DSOF ¶ 46.) Around June 2016, Plaintiff gained sole custody of his two young children and requested modification of his work schedule. (DSOF ¶ 70.) FFN granted Plaintiff's request. (*Id*.; Durkin Decl. at ¶¶ 5-6.)

Around July 2016, Plaintiff met with Durkin and stated that he was "stressed" and having some "personal issues." (DSOF ¶ 71; Durkin Decl. at ¶ 7.) Plaintiff became upset and started crying while talking to Durkin. (*Id*.) Durkin gave Plaintiff information about FFN's employee assistance program and he was permitted to take a week off work. (*Id*.) Plaintiff returned to work and, in August 2016, he closed his second-highest number of contracts. (Durkin Decl. at ¶ 72, DSOF, Ex. 13; PSSOF ¶ 10.) Plaintiff alleges that around that same time he noticed a camera had been installed at his work station. (17-2647 Doc. 26 at ¶ 40.) Plaintiff, however, admits that he does not have any evidence to support this allegation. (Powell Depo at 29-30.)

In August 2016, Plaintiff's team leader Carr was promoted to sales manager and Plaintiff was transferred to a team lead by Ben Whitlach. (DSOF ¶ 12; PCSOF ¶ 12.) In October 2016, Plaintiff and Whitlach had a confrontation about Plaintiff's transfer rate.[10] (DSOF ¶ 47; Powell Depo. at 196-97; DSOF, Ex. 14.) Plaintiff alleged that his emails were not sending, he had issues transferring clients, and the "missed transfers" prevented him from earning weekly performance bonuses. (PSSOF ¶ 12; Powell Depo. at 191-95, 217-21.) Plaintiff complained to management that his leads were not being tracked properly. (PSSOF ¶ 12; DSOF ¶ 49.) Plaintiff alleges after he told Carr that he took prescription pain medication, "pop ups" appeared on his computer that prevented him from transferring leads and his performance declined. (PSSOF ¶¶ 16, 46; Powell Decl. ¶¶ 16, 17, 18; Doc. 161-2 at 25.) Plaintiff alleges that management would tell him the issue was fixed, but the issue would return. (Powell Depo. at 224.) Plaintiff alleges that "Brian in

---

[10] When an AE encounters a potential client who is not suited for FFN's debt relief programs, the AE is required to try to transfer the lead to one of FFN's partners who offer different services (such as bankruptcy counseling). The percentage of leads that are transferred is the AE's "transfer rate." AEs must maintain a certain transfer rate (typically 12.5%) to be eligible for a commission, which is known as a spiff. During his employment, Plaintiff's transfer rate never prevented him from receiving a spiff when he was otherwise eligible. (DSOF ¶¶ 60-61.)

IT" confirmed that Freedom Plus "pop ups" were appearing on Plaintiff's computer and told Plaintiff that he must have been placed in that queue "by hand." (Powell Decl. ¶ 16; Doc. 161-2 at 24-32 [Decl. Ex. 12].)

At Plaintiff's request, FFN transferred him to a team lead by Ron Suan. (DSOF ¶ 48; Powell Depo. at 196-97; DSOF, Ex. 14.) After he joined Suan's team, Plaintiff arrived late to work several times between October and December 2016 and was absent several times in December 2016. (DSOF ¶ 75; DSOF, Ex. 20.) Plaintiff gave FFN a note from Agave Pediatrics indicating that he was absent in mid-December due to his child's illness. (DSOF ¶ 76; DSOF, Ex. 21.) Plaintiff alleges that FFN was manipulating his sales leads because Suan removed a lead from his queue on one occasion. (Powell Depo at 183-85.) However, Plaintiff concedes that it was FFN's policy to remove leads from an AE's queue if the employee was out of the office so the lead could be contacted in a timely manner. (Powell Depo at 183-85.)

Between July and December 2016, Plaintiff's client enrollments declined to an average of about twenty-eight enrollments per month. (DSOF ¶ 49.) On February 7, 2017, Plaintiff met with Durkin.[11] (DSOF ¶ 89; Durkin Decl. at ¶ 11.) Plaintiff complained that FFN was assigning him "false" leads created by FFN to "get him out" of the company. (DSOF ¶ 89; DSOF, Ex. 23; Powell Depo. at 239.) Plaintiff alleged that FFN's quality assurance representatives called him and posed as clients to get him to "blow up on a call" and that FFN put a "bounty" on him, which included a reward if an employee could get him to "blow up on a call." (Powell Depo. at 211, 213, 217, 296-97.) Plaintiff attributed FFN's purported conduct to his tattoos, his status as a single father, and a retaliatory campaign stemming from the BBB complaint filed in May 2016. (DSOF ¶ 90; DSOF, Ex. 23; Powell Depo. at 230, 245-46.)

Durkin investigated Plaintiff's allegations, spoke with Plaintiff's supervisor about his sales performance, and reviewed Plaintiff's time cards, his weekly lead assignments,

---

[11] Plaintiff disputes FFN's description of the February 7, 2017 meeting with Durkin but he does not offer any evidence to support that disagreement. (PCSOF ¶¶ 89-95.)

- 5 -

and closure rates. (DSOF ¶ 91; Durkin Decl. ¶ 13.) Plaintiff's time cards showed that he had called off from work and left work early multiple times in January 2017. (Durkin Decl. at ¶ 13; DSOF, Ex. 24.) Additionally, records reflected that when Plaintiff did not work a full schedule, he accepted fewer leads and generated fewer client contracts. (DSOF ¶ 92; Durkin Decl.¶ 14.) When Plaintiff worked a full schedule, his sales closure rate was consistent with his prior production. (Durkin Decl. at ¶ 14.) Durkin also reviewed lead management data going back three months with Gallegos. (DSOF ¶ 93; Durkin Decl. ¶ 15.) After her investigation, Durkin concluded that she could not substantiate Plaintiff's allegations of "false" leads or any retaliatory conduct by FFN towards Plaintiff. (DSOF ¶ 94; Durkin Decl. at ¶ 16.) On February 16, 2017, Durkin met with Plaintiff and shared the results of her investigation and encouraged Plaintiff to accept his supervisors' feedback about how to improve his sales communication. (DSOF ¶ 95; DSOF, Ex. 25; Durkin Decl. at ¶ 18.) Plaintiff stated that he did not have performance issues and asserted that FFN was assigning him "false" leads. (DSOF at ¶ 96; DSOF, Ex. 25; Durkin Decl. at ¶ 19.)

On February 21, 2017, Plaintiff filed a charge of discrimination with the EEOC (the "EEOC Charge"). (DSOF, Ex. 26.) Plaintiff claimed that on July 1, 2016, he informed Durkin about his "disability" and that since then he had been "denied the same quality of leads" as his peers, experienced a decline in his pay, and been placed on a "different tier level." (*Id*.) The next day, Plaintiff asked Durkin for information about his eligibility for FMLA leave, which she provided. (DSOF ¶ 99; PCSOF ¶ 99; Powell Depo. at 256-57.)

On February 28, 2017, Suan and Carr met with Plaintiff and provided feedback on his sales-call communications skills. (DSOF at ¶ 102; Carr Decl. at ¶ 30-33; Powell Depo. at 283-85.) Plaintiff claimed that FFN was creating "fake" sales leads for him. (Powell Depo. at 283; Carr Decl. at ¶ 33.) He also stated that his sales pitch was "perfect" and that his attendance was not affecting his performance. (Carr Decl. at ¶ 33.) Plaintiff asserts that Suan and Carr did not address his "concerns" but told him to "go somewhere else to work." (PCSOF ¶ 102.)

On March 9, 2017, Plaintiff informed Durkin that he was experiencing anxiety due to his meeting with Suan and Carr. (DSOF ¶ 103; DSOF Exs. 7, 30; Powell Depo. at 303-05; PSSOF ¶ 24.) Plaintiff also stated that he had been seeing a therapist for anxiety, which he had been experiencing due to "discrimination" over the past several months. (DSOF, Ex. 30.) At Plaintiff's request, FFN reassigned Plaintiff to a sales team with team lead Bob Hui. (DSOF ¶ 14; Powell Depo. 342.)

On March 20, 2017, FFN received a certification of serious health condition from Plaintiff's healthcare provider stating that Plaintiff had an anxiety disorder that had begun "approximately 3/15/2017." (DSOF ¶ 104; DSOF, Ex. 31.) The healthcare provider recommended at twelve-week leave of absence. (DSOF, Ex. 31.) Plaintiff requested and was granted a leave of absence from March 12 to June 12, 2017. (DSOF ¶¶ 104-06; Powell Depo. at 257, 260, 308, 311; PSSOF ¶ 24.) Powell returned to work on June 13, 2017, after providing a note from his healthcare provider that allowed him to return to work with no restrictions. (DSOF ¶ 106; DSOF, Ex. 32.)

On June 28, 2017, Mira Makarem sent an email to the sales teams stating that FFN was no longer accepting time-off requests for July 3, 2017 because too many employees had requested that day off. (DSOF ¶ 107; DSOF, Ex. 33.) Plaintiff claims that he did not see that email. (Powell Depo at 310.) On June 29, 2017, Plaintiff submitted a request to take July 3, 2017 off because his children's daycare would be closed that day. (DSOF ¶ 108; DSOF, Ex. 33; Powell Depo. at 311-14; PSSOF ¶ 30.) The same day, Ron Rinehart denied Plaintiff's request. (DSOF, Ex. 33.) He explained that FFN was no longer accepting time-off requests for that day and stated that he had also denied requests from other employees. (DSOF ¶ 109; DSOF, Ex. 33.)

On June 29, 2017, Plaintiff submitted a handwritten letter stating that he was resigning due to FFN's discrimination and a hostile work environment. (DSOF ¶ 110; DSOF, Ex. 34.) Plaintiff also emailed his resignation to Rinehart and copied all employees and teams and stated that he was resigning due to discrimination, harassment, and constructive discharge. (DSOF, Ex. 34.)

## II. Summary Judgment Standard

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Conclusory allegations contained in the pleadings, which are unsupported by factual evidence, are insufficient to defeat a motion for summary judgment. *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1237 (9th Cir. 1998). Similarly, an affidavit that recites conclusory allegations will not defeat summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990); *see also Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) (while plaintiff's burden at the summary judgment stage is not overly burdensome, plaintiff cannot merely rely on generalizations). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers Defendant's motion for summary judgment under these standards.

## III. ADA Disparate Treatment Claim

In Count Three of the SAC, Plaintiff alleges a disparate treatment claim under the ADA. (17-2627 Doc. 26.) Plaintiff claims that his sales dropped after he disclosed his disability to his supervisors and that FFN took various adverse actions to hinder his performance. (*Id*.)

### A. Elements of Prima Facie Case and the Burden Shifting Analysis

The ADA "forbids discrimination against disabled individuals in major areas of public life," including employment, public services, and public accommodations. *PGA Tour, Inc., v. Martin,* 432 U.S. 661, 675 (2001). To establish a prima facie case of

discrimination under the ADA, a plaintiff must show that he: (1) is "disabled" within the meaning of the statute; (2) is a "qualified individual" (he is able to perform the essential functions of his job, with or without reasonable accommodations); and (3) suffered an adverse employment action because of his disability. *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citing 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable accommodation)). If a plaintiff establishes a prima facie case of discrimination, the court applies the *McDonnell Douglas* burden-shifting analysis to his claims.[12] *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003) (applying *McDonnell-Douglas* burden shifting framework to ADA disability discrimination claim).

Under this burden-shifting analysis, a plaintiff must first establish a prima facie disability discrimination claim. *Id*. at 49 n.3. If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* If the employer proffers such a reason, "the presumption of intentional discrimination disappears," but the plaintiff can still prove discrimination by offering evidence demonstrating that the employer's explanation for the adverse action was a pretext. *Raytheon*, 540 U.S. at 49 n.3.; *see also Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (analyzing pretext in the context of an ADA retaliation claim). Defendant argues that Plaintiff cannot meet his burden of establishing a prima facie case of disparate treatment under the ADA because FFN did not take any adverse actions against him. (Doc. 148 at 9-10.) In its motion for summary judgment, Defendant does not dispute the other elements of the prima facie case. (*Id*.)

### B. Alleged Adverse Employment Actions

To state a claim for discrimination under the ADA Plaintiff must establish that he suffered an adverse employment action because of his disability. *Sanders v. Arneson Prods., Inc*., 91 F.3d 1351, 1353 (9th Cir. 1996). An adverse employment action is one that "materially alters the 'terms and conditions' of the plaintiff's employment." *Mamola v. Group Mfg. Servs*., 2010 WL 1433491, at *6 (D. Ariz. Apr. 9, 2010) (citing *Kang v. U.*

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Lim. Am., Inc.*, 296 F.3d 810, 819 (9th Cir. 2002)); *see also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). To satisfy this element of the prima facie case, Plaintiff complains about a variety of issues during his employment at FFN. The Court discusses these alleged adverse employment actions below.

### 1. Manipulation of Sales Leads

Plaintiff alleges that after he disclosed his alleged disability to Durkin and Carr around April or July 2016, his sales declined because FFN intentionally manipulated his sales leads.[13] (Doc. 159 at 5-6, 10.) As Defendant notes, Plaintiff's allegations are similar to those the court considered in *Rasco v. BT Radianz*, 2009 WL 690986 (S.D.N.Y. Mar. 17, 2009). In *Rasco*, the plaintiffs brought discrimination claims against their employer under Title VII, alleging that they were given fewer and less-valuable sales leads than their Caucasian peers. *Id*. The court granted summary judgment for the employer, reasoning that the plaintiffs had "not produced a modicum of evidence, apart from their own self-serving assertions and beliefs, that they received fewer, or less-valuable sales opportunities, let alone that sales opportunities were assigned discriminatorily." *Id*. As discussed below, like the plaintiffs in *Rasco*, Plaintiff has not produced evidence to support his allegations that he was given inferior leads.

Additionally, Plaintiff alleges that FFN manipulated his sales leads by "hand plac[ing]" leads in his queue and not dispersing leads to him through FFN's software program. (Doc. 159 at 10.) Plaintiff's claim that FFN manipulated his sales leads is unsupported. Defendant has produced evidence that FFN's leads are distributed according to an algorithm in FFN's lead generation software. (DSOF ¶¶ 77-82.) Defendant has also produced evidence that FFN's management and human resources employees cannot modify or manipulate the algorithm. (DSOF ¶ 84.) During his deposition, Plaintiff testified that Suan removed one lead from his sales queue. (Powell Depo at 183.) Plaintiff agreed that when an AE misses three consecutive days of work, FFN can remove leads from an

---

[13] In the EEOC Charge, Plaintiff asserted that the alleged adverse employment actions started after July 1, 2016 when he told Durkin about his alleged disability. (DSOF, Ex. 26.)

- 10 -

AE's queue and place them with another AE. (*Id*. at 183-84; DSOF ¶ 83.) Plaintiff's assertion that FFN removed one lead from Plaintiff's queue, however, is insufficient to create a genuine issue regarding whether FFN manipulated Plaintiff's sales leads to his detriment. Plaintiff does not offer any evidence supporting his assertion that FFN manipulated Plaintiff's sales leads to provide him with inferior or fake sales leads.

Plaintiff's assertion that he started receiving lower quality or fake sales leads after he disclosed his alleged disability in April or July 2016 is not supported by the evidence. Plaintiff asserts that his sales started strong, then dropped after he told Carr, his team lead, of his use of pain medication, and after he told Durkin in HR that he was stressed and took a week off work. However, he admits that when he returned to work he "felt better" and qualified for FFN's 5-million-dollar club in July. (Doc. 159 at 5; PSSOF ¶ 10.) Additionally, Plaintiff had one of his best sales months in August 2016. (DSOF ¶ 72; DSOF, Ex. 13; Doc. 159 at 5.) As FFN argues, Plaintiff's successful sales performance in August 2016, after FFN allegedly started to discriminate against him, does not support Plaintiff's allegations that FFN had been manipulating his sales leads to his detriment starting in April or June 2016. Although manipulating an employee's sales leads could be considered an adverse action, Plaintiff has not provided specific or substantial evidence that FFN intentionally provided him with poorer quality sales leads based on his disability. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006) (stating that when a plaintiff relies on circumstantial evidence, that evidence must be both "specific and substantial" to create a triable issue on whether the employer intended to discriminate).

### 2. Information Technology Issues

Plaintiff also claims that, after he disclosed his alleged disability, FFN created various information technology ("IT") or computer issues that caused his sales to decline. (Powell Depo. at 186-89, 254.) Specifically, Plaintiff claims that "pop ups" prevented him from transferring sales leads, he was placed in a "disparate call queue," his transfers were not recorded for several weeks, his time was not properly record once, he received only

five web call backs ("WCBs") on February 23, 2017, and his leads were turned off "because of Report 32111." (Doc. 159 at 6-7; Powell Depo. at 187.)

Plaintiff's ability to transfer sales leads and his related "transfer rate" determined whether he was eligible for a commission or spiff. (DSOF ¶¶ 60-61 (stating that, among other requirements, to be eligible to "spiff" an AE must have a transfer rate of at least 12.5%).; DSOF, Ex. 16; Carr Decl. ¶ 20.) FFN has provided evidence that Plaintiff's transfer rate never prevented him from "spiffing." (Carr Decl. ¶ 21.) Thus, if any IT issues impacted Plaintiff' ability to transfer a sales lead or record those transfers, those issues did not amount to an adverse action.

Plaintiff also asserts that he was placed in a "disparate call queue" or that his sales leads were "hand placed" in his call queue. (*Id.*; Powell Depo. at 178, 180, 186-89, 200-01, 211-14, 254, 268, 270, 272-75, 293-95.) To support this assertion, Plaintiff provides emails in which he complains that he had been placed in a Freedom Plus queue in October 2016 and March 2017. (Doc. 161-2 at 25-31.) However, Plaintiff has not provided any evidence that FFN intentionally placed him in the Freedom Plus queue on these two occasions. In his declaration, Plaintiff states that "Brian in IT" told him he must have been hand-placed in that call queue. (Doc. 161 at ¶ 16.) Plaintiff's reliance on an inadmissible hearsay comment by "Brian in IT" does not create a triable issue of fact.

Plaintiff has not offered any evidence to support his assertion that FFN intentionally caused the IT issues, including the problems related to WCBs, his sales leads, and recording his time. Robert Curtis, who has been FFN's director of IT since September 2015, stated that "FFN employees occasionally encounter IT issues and problems." (Curtis Decl. at ¶ 5.)[14] FFN employees can contact the help desk for assistance resolving their IT issues. (DSOF ¶¶ 112-15; Curtis Decl. at ¶ 6.) Curtis states that Plaintiff reported several IT issues, but no more IT issues than other AEs reported, and the issues were resolved in a "short period of time." (Curtis Decl. at ¶¶ 8-9 and Ex. A (listing Plaintiff's "IT tickets").) During his deposition, Plaintiff confirmed that the help desk resolved his IT problems when they

---

[14] The Robert Curtis Declaration ("Curtis Decl.") is filed at DSOF, Ex. 35.

- 12 -

arose. (Powell Depo. at 158-161, 224-25.) Plaintiff asserts that the IT problems would arise again after they were fixed (*id*. at 159, 161, 224), but he has not offered evidence indicating that other AEs experienced fewer IT problems than he did or that FFN intentionally created the IT issues he encountered because of his alleged disability. *See Samper*, 675 F.3d at 1237.

### 3. Written Discipline

Plaintiff also complains about receiving written discipline after FFN received a BBB complaint from a prospective client on April 28, 2016.[15] (PCSOF ¶¶ 39-41; DSOF ¶¶ 38-41.) FFN issued Plaintiff a written warning for violating FFN's policy on "business ethics and conduct." (DSOF, Ex. 12.) The warning stated that Plaintiff "must never treat a client or potential client rudely in any manner. [Plaintiff] must at all times be honest, ethical, and compliant in his interaction with customers." (*Id*.) The warning further stated that "[f]ailure to adhere to these policies and practices could result in further disciplinary action, up to and including termination." (*Id*.) Plaintiff admits that he acted unprofessionally toward the prospective client. (Powell Depo. at 78-80, 91.)

A written warning alone does not constitute an adverse action when it does not materially affect the terms and conditions of employment. *See Moore v. Marriott Int'l, Inc*., 2014 WL 5581046, at *10 (D. Ariz. Oct. 31, 2014). Because Plaintiff received two written warnings in 2016, he was disqualified from the president's club.[16] (DSOF ¶¶ 55, 56; DSOF, Carr Decl. ¶ 10 and attached spreadsheet.)[17] The president's club is an "incentive" to reward "consistent and exceptional New Client Enrollment performance."

---

[15] Plaintiff also received a warning on March 31, 2016. (DSOF ¶ 56.)

[16] Plaintiff claims that during an early 2017 sales meeting with over 250 employees, Kevin Gallegos "discriminated against him" when he "smirked" at Plaintiff while announcing the AEs who had qualified for president's club, which did not include Plaintiff. (Powell Depo. at 241-42; DSOF ¶ 57; 17-2646 Doc. 26 at ¶ 54.) An allegation that Gallego's smirked at Plaintiff does not create a genuine issue as to whether FFN took an adverse action against Plaintiff based on his alleged disability.

[17] The spreadsheet attached to Carr's declaration indicates that Plaintiff "missed" the target for the 2016-17 and it also indicates that he was disqualified. (Carr Decl. ¶ 10 and attached spreadsheet).

- 13 -

(DSOF, Ex. 16 at 9.) The 2016 New Client Enrollment Information Package stated that FFN was continuing the presidents club in 2016. (*Id*.) The president's club members earned an all-expenses paid vacation or could chose a $1,500 cash equivalent. (DSOF ¶ 54; Carr Decl. ¶ 8; Gallegos Decl. ¶ 31; DSOF, Ex. 16 at 9.) An AE gained entry in the president's club by meeting three specific criteria. (DSOF, Ex. 16 at 9.) However, an AE who received a written corrective action within the "2016 calendar year" could not be considered for the president's club. (*Id*.; *see also* DSOF ¶ 55; Carr Decl. ¶ 9; Gallegos Decl. ¶ 22.)

The written warning that Plaintiff received did not constitute an adverse employment action because the denial of a discretionary perk, eligibility for the president's club, was not an adverse employment action. *See e.g. Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (stating that the denial of a "monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary."); *see also Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) (a warning letter which affected no materially adverse change in the terms and conditions of the plaintiff's employment was not an adverse employment action).

### 4. Insurance Plan

Plaintiff claims that FFN intentionally enrolled him in the wrong medical insurance plan in 2016 because of the high cost of his pain medication. (DSOF ¶ 24; PCSOF ¶¶ 16, 20; Powell Depo. at 110, 113.) Plaintiff does not dispute that FFN employees participate in open enrollment annually and either elect a benefit package or opt out. (DSOF ¶ 21; PCSOF ¶ 21.) Employees who do not make an election by the deadline are assigned to the same (or an equivalent) benefit package they elected the prior year. (DSOF ¶ 22.) Linda Luman, FFN's Senior Vice President of Human Resources since March 2015, states that in 2015, Plaintiff did not make an election of benefits for 2016 by the deadline.[18] (DSOF

---

[18] Plaintiff asserts that he was not employed by FFN in 2015, and thus, did not have a benefit choice for 2015. (PCSOF ¶ 23.) The record, including Plaintiff's own statements, confirm that FFN hired Plaintiff in October 2015 with a "reporting date October 19, 2015."

- 14 -

¶ 23; Luman Decl. ¶ 7).[19]  Therefore, Plaintiff was assigned the same medical insurance plan for 2016 that he been enrolled in for 2015. (Luman Decl. ¶ 8.) Luman states that FFN did not change Plaintiff's election of benefits, and Plaintiff has not presented any evidence to contradict that statement. (DSOF ¶ 25; Luman Decl. ¶ 9.) Additionally, Plaintiff alleges that FFN changed his benefits in January 2016, but he did not disclose his alleged disability to anyone at FFN until April 2016. (PCSOF ¶ 20; Powell Depo. at 68-69, 105, 110-13, 214-16; Doc. 159 at 4.) Thus, even if FFN changed Plaintiff's insurance benefits, it could not have done so based on Plaintiff's disability, which he had not yet disclosed.

Plaintiff further claims that FFN did not let him change his benefits plan during 2016 when his two children lost their insurance and he received full custody of them. (Powell Depo. at 113-15; *see* Luman Decl. ¶ 11.) FFN's policy allows employees to add dependents to their benefit plans outside of open enrollment when the dependents have a qualifying life event, such as losing insurance coverage. (DSOF ¶ 26; Luman Decl. ¶ 26.) Although an employee may *add* children who had a qualifying life event to the employee's benefit plan, an employee may not *change* his benefit plan at that time. (Luman Decl. ¶ 26.) During 2016, Plaintiff informed FFN that his children had lost insurance coverage and requested to change his benefits plan. (*Id.* at ¶ 11.) FFN told Plaintiff that he could add his children to his existing plan, but he could not change to a different benefit plan until open enrollment. (*Id.* at ¶ 12.) FFN's policy regarding changes to insurance plans applied to all employees. (*Id.* at ¶ 10.) FFN's application of this policy to Plaintiff was not an adverse employment action.

### 5. IAPDA Test

In his response to the motion for summary judgment, Plaintiff, for the first time, asserts that he was required to take the IAPDA test a second time during his employment

---

(DSOF, Ex. 3; Powell Depo. at 22, 66; Doc. 159 at 3.) Plaintiff told Durkin that he wanted to enroll in the medical insurance plan with the lowest monthly employee premium. (Durkin Decl. at ¶ 4; Powell Dep.o at 112.)

[19] The Linda Luman Declaration ("Luman Decl.") is filed at DSOF, Ex. 8.

- 15 -

with FFN but other AEs only had to take it once.[20] (Powell Decl. ¶ 28; Doc. 159 at 11.) To support this assertion, Plaintiff cites a January 20, 2016 email from Chenelle Reed to twenty-eight AEs, stating, "[d]ue to changes in the 2016 New Client Enrollment Information Package, if you have been employed for more than 60 days, you must make this a priority. Please complete the IAPDA Certification immediately . . . If you have already received your certificate, please forward it to me." (Doc. 161-4 at 29.) Thus, many AEs had to take the IAPDA test or forward their certificates. (*Id.*) Plaintiff has provided evidence that he received a Certificate of Achievement from the IAPDA dated October 25, 2016. (Doc. 161-4 at 25.) But he has not provided any evidence that FFN required him to take the IAPDA test twice.

### 6. Denial of Vacation Request

Plaintiff also complains about the denial of his request to take time off on July 3, 2017. On June 28, 2017, Makarem sent all sales teams an email stating that FFN was no longer accepting time-off requests for July 3, 2017. (*See* DSOF ¶ 107; DSOF, Ex. 33.) The next day, Plaintiff submitted a request to take that day off work because his children's daycare would be closed. (DSOF ¶ 108; DSOF, Ex. 33; Powell Depo. at 311-14; PSSOF ¶ 30.) The same day, Rinehart denied Plaintiff's request. (DSOF, Ex. 33.) He explained that FFN was no longer accepting time-off requests for that day and stated that he had also denied requests from other employees. (DSOF ¶ 109; DSOF, Ex. 33.) Even if the denial of Plaintiff's time-off request constitutes an adverse action, Defendant offered a legitimate, nondiscriminatory reason for denying Plaintiff's request. Plaintiff does not dispute that Makarem emailed the AEs on June 28, 2017 stating that time-off requests for that date were closed due to a high volume of requests. (DSOF ¶ 107, DSOF, Ex. 33.) July 3, 2017 was on a Monday, the day before the July 4th holiday, so many employees requested to take that day off work. (DSOF ¶ 107.) Plaintiff submitted his request to take July 3 off work on June 29, 2017, the day after Makarem sent the email stating that requests for time-

---

[20] FFN states that this test is required to receive a certification for the Certified Debt Specialist Program with the International Association of Professional Debt Arbitrators ("IAPDA"). (Doc. 164 at 6 n.3.)

- 16 -

off were closed for July 3. (DSOF ¶ 108.) Plaintiff's request was denied, as were the requests of several other AEs. (*Id*. at ¶ 109.) Thus, Plaintiff was treated the same as the other AEs whose time-off requests were denied and there is no evidence that FFN denied Plaintiff's request based on his disability.

### 7. Installing a Camera

Plaintiff met with Durkin in July 2016 and expressed that he was "stressed" and having some "personal issues," and he was permitted to take a week off work. (DSOF ¶ 71; Durkin Decl. at ¶ 7.) Plaintiff claims that when he returned to work he noticed a camera had been installed at his work station. (17-2647 Doc. 26 at ¶ 40.) FFN denies installing a camera at Plaintiff's work station and Plaintiff admits that he does not have any evidence to support this assertion. (DSOF ¶¶ 124, 127; Powell Depo. at 29-30.) Additionally, Plaintiff has not offered any evidence indicating that the alleged installation of the camera affected the terms and conditions of Plaintiff's employment. Thus, the alleged installation of a camera at Plaintiff's workstation does not satisfy the adverse action element of the prima facie case.

### 8. Bounty

Plaintiff also alleges that FFN put a "bounty" on him, which included a reward if an employee could get him to "blow up" on a call. (DSOF ¶ 122.) Plaintiff has not offered any evidence to substantiate this assertion. (*See* DSOF ¶ 126.) Thus, the alleged "bounty" does not satisfy the adverse action element of the prima facie case.

For these reasons, the Court concludes that Plaintiff's claim of disparate treatment under the ADA fails because he had not offered evidence that is sufficient to show that FFN took an adverse action against him or to create a triable issue on whether the FFN intended to discriminate based on his alleged disability. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006). Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's disparate treatment claim.

///

///

### IV. Constructive Discharge Claim

In Count Five, Plaintiff alleges that "FFN's retaliatory conduct made it objectively difficult and created an unpleasant workplace so that a reasonable person would feel compelled to resign." (17-2647 Doc. 26 at 12.) Constructive discharge occurs when, "looking at the totality of the circumstances, 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.'" *Wallace v. City of San Diego*, 479 F.3d 616, 625-26 (9th Cir. 2007) (citations omitted). "'Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury.'" *Id*. (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996)). To prevail, "'a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment.'" *Wallace*, 479 F.3d at 626 (quoting *Schnidrig*, 80 F.3d at 1412). Furthermore, "[a]lthough 'a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge, [the Ninth Circuit has] upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years.'" *Wallace*, 479 F.3d at 626 (quoting *Watson v. Nationwide Ins., Co*., 823 F.2d 360, 361 (9th Cir. 1987)).

Defendant argues that if the Court grants summary judgment on Plaintiff's disparate treatment claim it must also grant summary judgment on his constructive discharge claim because "'constructive discharge is not a cause of action in its own right.'" (Doc. 148 at 16-17 (quoting *Anderson v. Arizona*, 2007 WL 1461623, at *16 (D. Ariz. May 16, 2007).) "A prima facie case for constructive discharge requires 'something more' than actionable discrimination." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job"). Because the Court has

granted summary judgment on Plaintiff's claim of disparate treatment, his claim of constructive discharge also fails.

Constructive discharge occurs when "working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Equal Emp't Opportunity Comm'n v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1030 (D. Ariz. 2013) (quoting *Brooks*, 229 F.3d at 930). Plaintiff's allegations are insufficient to establish that his working conditions were so intolerable that he was forced to quit. *See Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184-85 (9th Cir. 2005) (affirming summary judgment on plaintiff's constructive discharge claim); *Brooks,* 229 F.3d at 930 (same); *Schnidrig*, 80 F.3d at 1411 (same); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465-66 (9th Cir. 1994) (same). Plaintiff complains that he received poor quality sales lead, had various IT issues, and was denied time off in July 2017. (*See* Doc. 159 at 11.) However, as previously discussed above in Section III.B.1, Plaintiff received sales leads pursuant to the same system as the other AEs. Additionally, the help desk assisted Plaintiff with his IT issues. *See* Section III.B.2.

Plaintiff also complains that he was denied time off in July 2017. However, before Plaintiff made that request, FFN had informed all sales employees that such requests would be denied due to high demand. *See* Section III.B.6. FFN denied time-off requests for July 3, 2017 after it made that announcement. *See id*.

To survive summary judgment on his constructive discharge claim, Plaintiff "must show there are triable issues of fact as to whether 'a reasonable person in [his] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions.'" *Steiner*, 25 F.3d at 1465 (quoting *Thomas v. Douglas*, 877 F.2d 1428, 1343 (9th Cir. 1989)). Plaintiff has not made that showing. Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's constructive discharge claim.

**V. Conclusion**

For these reasons, the Court grants summary judgment in favor of Defendant on Plaintiff's disparate treatment claim under the American with Disabilities Act ("ADA"), alleged in Count Three, and his constructive discharge claim alleged in Count Five. (*See* 17-2647 Doc. 26; Doc. 65 at 24.)

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 148) is **GRANTED**. The Clerk of Court shall enter judgment in favor of Defendant and terminate this matter.

Dated this 11th day of March, 2019.

_____
Bridget S. Bade
United States Magistrate Judge